NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0967n.06

No. 12-3402

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 12, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TRACY JONES, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KIM JONES, individually and as administrator of the estate of BRYAN JONES, Deceased, and Tracy Jones, Deceased, | ) ) ) | **ON APPEAL** FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | **O P I N I O N** |
| SANDUSKY COUNTY, OHIO; SANDUSKY COUNTY BOARD OF COMMISSIONERS; KYLE OVERMYER, Sheriff, Sandusky County; JOSE CALVILLO, and MARIO CALVILLO, | ) ) ) ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before:  WHITE and DONALD, Circuit Judges, and VARLAN, Chief District Judge.*

**THOMAS A. VARLAN, Chief District Judge.** Plaintiffs-Appellees Tracy Jones ("Tracy"),

individually and as administrator of decedent Bryan Jones ("Jones"), and Kim Jones ("Kim")

(collectively, "plaintiffs") brought suit against Defendants-Appellants Sandusky County, Sandusky

County Sheriff Kyle Overmyer ("Overmyer"), and deputies Jose Calvillo ("Jose") and Mario

---

*The Honorable Thomas A. Varlan, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

Calvillo ("Mario")[1] (collectively, "defendants") for the shooting death of Jones, which occurred on July 11, 2010, asserting violations of Jones's Fourth Amendment right to be free from excessive force under 42 U.S.C. § 1983 and bringing claims under Ohio statutory and common law. Both parties filed motions for summary judgment. The district court heard oral argument and later issued a memorandum opinion denying both motions.

On appeal, defendants argue that 1) the district court erred in denying summary judgment on the basis of qualified immunity for Jose and Mario for plaintiffs' § 1983 claims because the district court did not follow the requisite analysis for the availability of qualified immunity and made several errors in analyzing the reasonableness of defendants' actions under the Fourth Amendment; 2) the district court erred in denying summary judgment to Overmyer on plaintiffs' supervisory liability claim; 3) the district court erred in denying summary judgment on plaintiffs' municipal liability claim as to Sandusky County; and 4) the district court erred in denying summary judgment on the basis of statutory immunity for the individual defendants on plaintiffs' state claims. For the reasons explained herein, we decline to exercise jurisdiction as to Sandusky County's appeal, reverse the district court's denial of summary judgment on qualified immunity grounds as to the use of the flash-bang device for defendants Mario, Jose, and Overmyer, and remand this case for further proceedings consistent with this opinion, but affirm the remainder of the district court's decision.

## I.  BACKGROUND

---

[1]Jose and Mario Calvillo are brothers.

2

This dispute arises from Jones's death at the hands of members of the Sandusky County Sheriff's Department. On the night of July 11, 2010, Tracy was preparing to leave the family residence for work when he got into an argument with his twenty-four year old son, Jones, who also resided in the home. During the course of the argument, Jones threatened to kill his mother, Kim, and told his father, "Your old lady's dead . . . click, click." (R. 41-2 at 16).[2] Tracy told his son to get out of the house, to which Jones responded that he had a gun, challenging Tracy to "go ahead and call the police, call them in front of me." (*Id.*). Tracy left and called 9-1-1 from his son Brandon's house, located a short distance from the Jones's residence. Jones remained at the house alone; Kim was not at the family residence at any relevant time.

At 9:46 p.m., the dispatcher received the call from Tracy. Tracy informed the dispatcher that sheriff's officers had been to the home earlier in the day to take Jones away "because he was really drunk and he came back and threatened to kill [Tracy's] wife." (R. 39-11 at 2:8). Tracy repeated that Jones had threatened to kill his wife and told the dispatcher that Jones had loaded guns in the house. He further told dispatch that Jones had been drinking for two days, was acting "crazier than heck," and would fight if the police arrived. Tracy informed dispatch that he wanted Jones out of the house. The dispatcher then notified two on-duty sheriff's deputies, informing them, mistakenly, that Jones "was going to kill everybody and himself." (*Id.* at 6:14). Dispatch also informed the

---

[2]The record indicates that earlier in the day Kim had called the sheriff's office due to a problem with Jones, but once police arrived, she indicated there was no further problem and Jones was not arrested.

3

deputies that Jones had loaded guns in the house and that he had been drinking heavily. The deputies arrived at the Jones's home shortly after 10:00 p.m.

Upon their arrival at the home the deputies looked into the living room window and observed Jones seated on a couch with his feet propped up on a coffee table and a shotgun laying across his lap. Jones's eyes were closed, but he occasionally moved around and half-opened his eyes. One of the deputies on the scene asked dispatch to attempt to make contact with Jones by calling the house, but there was no response after repeated rings, as Jones had unplugged the phone. Jones had no cell phone. The officers did not make any further effort to contact Jones.

Around this time Overmyer was alerted to the situation and made his way to the Jones's home. While driving over, Overmyer confirmed with dispatch that Jones had previously been involved in a drive-by shooting. Once he arrived at the home, Overmyer decided to bring additional officers from the local police department and the state highway patrol to provide assistance. Emergency medical personnel were put on stand-by. Overmyer further decided to activate the Sheriff's Office Tactical Response Team ("TRT")—the county's equivalent of a SWAT team. Deputies Jose, Mario, Allen Dorsey ("Dorsey"), and Kevin Karn ("Karn") were the four available TRT members that night. While the members of the TRT assembled and formulated a plan on how to proceed, Jones was under constant surveillance through the window. During this time period, approximately an hour and a half, Jones made few movements.

While Jones's true state of consciousness cannot be discerned from the record, defendants contend Overmyer had several concerns with such little movement on Jones's part. Overmyer thought Jones may have been asleep or passed out, given that he was under the influence of drugs

and alcohol, but also worried that Jones may either have been feigning sleep in order to ambush any would-be intruders or had overdosed or otherwise injured himself. For these reasons Overmyer authorized the TRT to make a forcible "dynamic entry," which was considered to be the best way to enter the home and apprehend Jones. Tracy was called back to the home to meet with the TRT, informing the officers as to the layout of the home and telling them that the kitchen door was unlocked. Tracy told deputies he wanted to go into the home and get Jones. The TRT denied Tracy's request to enter the home and speak with Jones, but Tracy did not object to the TRT's plan. Overmyer and Jose devised the following entry-plan: 1) the TRT would enter through the kitchen door; 2) Mario would carry a ballistic shield and enter first; 3) Karn would detonate a diversionary or "flash-bang" device; 4) Dorsey would open the door and come in last; and 4) the TRT would then apprehend Jones. The TRT initiated the plan at 11:30 p.m.

As planned, Dorsey opened the kitchen door for the others to make their way into the kitchen, which adjoined the living room where Jones was seated. After peeking around the corner to assure there were no flammable objects, Karn deployed the flash-bang device. Mario, Jose, and Karn then rushed into the living room to Jones's side and slightly from behind, repeatedly shouting "Sheriff's office, drop it," or "Sheriff's office, show us your hands," and otherwise ordering Jones to put down the gun.

According to the three deputies who entered the living room, Jones did not put down the gun. Karn stated that he saw the barrel of Jones's shotgun move to a position where it was pointed at the TRT, prompting him to take cover behind a cabinet. Mario saw the side of the shotgun when he first entered the room, then saw the muzzle of the gun move from the direction it was originally pointing

5

toward the TRT members. Mario later testified he had "no doubt" that Jones was going to fire at the team. Similarly, Jose saw Jones swing around and point the gun toward the TRT members. Jose yelled at Jones to stop, or "don't do it." All three officers believed that Jones intended to fire at the officers. In response, Jose and Mario discharged their weapons, killing Jones. Tracy testified that from outside the house he heard Jones scream "Why?" as shots were fired. The events that took place between defendants' entry and the shooting all occurred in a very short time period, as confirmed by those outside the home who heard the noise from the flash-bang device and gunshots in close succession.

Plaintiffs commenced this § 1983 suit, alleging a violation of Jones's rights under the Fourth Amendment and asserting a wrongful death action under Ohio statutory law as well as common law claims of negligence, recklessness, and intentional infliction of emotional distress. After discovery, both parties moved for summary judgment. Defendants moved for summary judgment as to all of plaintiffs' claims, arguing that no constitutional violation had occurred and that the individual defendants were entitled to qualified immunity. Following a recommendation from the magistrate judge that defendants' motion be granted and plaintiffs' motion be denied, the district court heard oral argument on plaintiffs' objections to the magistrate judge's recommendation. For reasons that will be discussed herein, the district court denied both defendants' motion for summary judgment and plaintiffs' motion for summary judgment, and ordered that the matter be set for a jury trial. This appeal timely followed.

## II. JURISDICTION

A threshold question we must answer is whether the we have jurisdiction to hear this appeal, as plaintiffs have submitted a motion to dismiss on jurisdictional grounds. Plaintiffs claim that this court lacks jurisdiction because defendants' motion for summary judgment depends on facts that are in dispute.

The denial of a motion for summary judgment ordinarily is not a "final order" but is an interlocutory ruling and thus is not subject to immediate appeal pursuant to 28 U.S.C. § 1291. *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008). An order denying qualified immunity to a public official, however, is immediately appealable pursuant to the "collateral order" doctrine. *Id.*; *Leary v. Livingston Cnty.*, 528 F.3d 438, 447 (6th Cir. 2008). Yet, appellate jurisdiction exists "only to the extent that a summary judgment order denies qualified immunity based on a pure issue of law." *Leary*, 528 F.3d at 447-48 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006)). This court may not exercise jurisdiction when a party before it is "merely quibbling with the district court's reading of the factual record." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) (quoting *Leary*, 528 F.3d at 441). Orders that determine "only a question of evidence sufficiency, *i.e.*, which facts a party may, or may not, be able to prove at trial . . . [are] not appealable." *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

Plaintiffs argue that the district court denied summary judgment for the individual defendants because there were factual disputes that precluded the court's determination of whether qualified immunity could be granted. In support, plaintiffs cite to the district court's conclusion that "the reasonableness of [d]efendants' actions is completely dependent upon which view of the facts is accepted by the jury." *Jones v. Sandusky Cnty.*, 889 F. Supp. 2d 990, 1005 (N.D. Ohio 2012). The

7

district court found that there was a factual issue as to Jones's state of consciousness and as to whether defendants followed their own training manual in making the decision to enter the house. *Id.* at 1003. The district court also found that a dispute existed as to whether Jose and Mario used excessive force in shooting Jones after entering the house. *Id.* at 1005. Accordingly, plaintiffs conclude, the district court denied summary judgment on qualified immunity grounds because of factual questions, precluding this court from having jurisdiction.

Although plaintiff correctly summarizes the district court's findings, "the district court's characterization of the basis for its ruling does not necessarily dictate the availability of appellate review." *Chappell*, 585 F.3d at 906; *see also Boyd v. Baeppler*, 215 F.3d 594, 597 (6th Cir. 2000) (noting that "the district court's assertion that there were genuine issue [sic] of material fact does not destroy the appealability of its qualified immunity ruling"). "If, apart from impermissible arguments regarding disputes of fact, defendants raise purely legal issues bearing on their entitlement to qualified immunity, then there are issues properly subject to appellate review." *Chappell*, 585 F.3d at 906; *see also Floyd v. City of Detroit*, 518 F.3d 398, 403 (6th Cir. 2008) (exercising jurisdiction and noting that the officers' qualified-immunity claims did not require consideration of whether there were genuine issues of fact for trial).

Here, defendants argue that the district court erred in denying summary judgment on the basis of qualified immunity by: 1) failing to apply the "clearly established" prong of the two-part *Pearson/Saucier* analysis for qualified immunity; 2) finding that a determination of reasonableness is a question of fact rather than a question of law; 3) considering the use of the flash-bang device as a separate use of "force" under the Fourth Amendment; 4) considering Jones's subjective

understandings rather than the defendants' objective observations in evaluating the use of deadly force; and 5) failing to properly apply this court's segmenting rules in evaluating the use of deadly force.

Like the defendants in *Chappell*, defendants argue that certain facts considered by the district court, such as whether Jones had time to comply with the officers' orders, were not material and did not create a genuine issue of material fact. *See* 585 F.3d at 906 ("[T]he district court's determination that there is a factual dispute does not necessarily preclude appellate review where, as defendants here contend, the ruling also hinges on legal errors as to whether the factual disputes (a) are *genuine* and (b) concern *material* facts."). Further, defendants object to the legal analysis the court applied to the facts not in dispute, specifically whether the court properly examined both prongs of the qualified immunity analysis set forth in *Pearson v. Callahan*, 555 U.S. 223 (2009), and the application of this court's segmenting rules. These issues are independent of any factual disputes that are to be determined by a jury. Thus, defendants "have identified purely legal issues that are, pursuant to the collateral order doctrine, subject to appellate jurisdiction." *Chappell*, 585 F.3d at 906 (citing *Livermore ex rel. Rhom v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007)). Accordingly, we have jurisdiction as to Mario's and Jose's appeals of the denial of summary judgment based on qualified immunity.

Similarly, defendant Overmyer argues that the district court improperly equated the availability of summary judgment to him with the issue of qualified immunity for defendants Mario and Jose. Because the claim against Overmyer is inextricably linked to the claims against Mario and

Jose, we have jurisdiction with respect to Overmyer's appeal of the denial of summary judgment on plaintiffs' supervisory liability claim.

As to plaintiffs' claims of municipal liability under § 1983, this court does not have interlocutory jurisdiction over the district court's denial of summary judgment as to Sandusky County because such an order is not immediately appealable. Qualified immunity does not protect municipalities, but shields only government officials from individual liability. *See Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000); *Meals v. City of Memphis*, 493 F.3d 720, 726 (6th Cir. 2007). "The Supreme Court has cautioned that there is no general appellate jurisdiction to consider issues related to claims that are capable of interlocutory appeal." *Meals*, 493 F.3d at 727. The court may only consider issues that are "inextricably intertwined" with the qualified immunity analysis. *Id.* Because we conclude that the district court properly determined that there were factual questions as to whether a constitutional violation occurred with respect to plaintiffs' claims against the individual defendants, we decline to exercise jurisdiction and dismiss Sandusky County's appeal because it is not "inextricably intertwined" with the question of the individual defendants' right to qualified immunity. *See Floyd*, 518 F.3d at 411 (citing *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 38 (6th Cir. 2005)) ("Once a violation is determined to have occurred, however, the question of municipal liability . . . [is] not 'indisputably coterminous with, or subsumed' in the question of qualified immunity.").

As to plaintiffs' state claims, the court "must look to state immunity law to determine whether a denial of immunity based on state law is appealable." *Livermore*, 476 F.3d at 407 (citing *Walton v. City of Southfield*, 995 F.2d 1331, 1343 (6th Cir. 1993)). In *Hubbell v. City of Xenia*, 873

N.E.2d 878 (2007), the Ohio Supreme Court held that a denial of immunity is appealable. Because the issues of qualified immunity and state immunity are "inextricably intertwined," the court will exercise pendent jurisdiction over this aspect of defendants' appeal. *Meals*, 493 F.3d at 726.

## III. STANDARD OF REVIEW

This court reviews a district court's denial of summary judgment on the grounds of qualified immunity de novo. *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). Summary judgment is appropriate when the pleadings, the discovery and disclosure of materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly" be considered a material fact so as to "preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A material fact is only in "genuine dispute" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and this court may not entertain these inquiries on a motion for summary judgment. *Id.* at 255.

The moving party bears the burden of demonstrating that no genuine issue of material fact exists, and in reviewing a motion for summary judgment the court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008); *Livermore*, 476 F.3d at 403 (noting that on an interlocutory appeal the court determines qualified immunity while accepting the facts as alleged by plaintiffs).

11

## IV.  DISCUSSION

### A.       Qualified Immunity on Plaintiffs' Fourth Amendment Claims

Plaintiffs allege that Jose and Mario violated Jones's Fourth Amendment right to be free from unreasonable search and seizure by deploying the flash-bang device and subsequently shooting Jones in his home.  Defendants have invoked qualified immunity and contend that the district court erred in denying Jose's and Mario's claims of qualified immunity as to plaintiffs' § 1983 action at the summary judgment stage.

Government officials are immune from civil liability under § 1983 when performing discretionary duties, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is a defense not just against liability, but against suit itself.  *Chappell*, 585 F.3d at 907 (citation omitted).  Qualified immunity seeks to prevent government officials, such as police officers, from being held liable for reasonable mistakes, including mistakes of law, fact, or mixed questions of law and fact. *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 443 (6th Cir. 2012) (citing *Groh v. Ramirez*, 540 U.S. 551, 566-67 (2004) (Kennedy, J., dissenting)).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Chappell*, 585 F.3d at 907 (internal quotation marks omitted).

To determine whether qualified immunity is available to a government official, the Supreme Court instructs courts to use a two-prong test, inquiring as to (1) whether the facts alleged show the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the violation. *Id.*  Plaintiff bears the burden of satisfying both prongs, and a failure

to show either means the plaintiff has failed to carry her burden. *Id.* "The Court has emphasized that the qualified immunity analysis 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Livermore*, 476 F.3d at 403 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Plaintiffs allege that qualified immunity is unavailable because Jose and Mario violated Jones's Fourth Amendment right to be free from excessive force during an arrest, a right that is "well-grounded" in the law. *Id.* at 404 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen must be analyzed under the Fourth Amendment and its reasonableness standard[.]" *Graham*, 490 U.S. at 395 (internal quotation marks and emphasis omitted). *Graham* requires courts to engage in a "'careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555, 569 (6th Cir. 2006) (quoting *Graham*, 490 U.S. at 396). When analyzing the objective reasonableness of a use of force, courts are not permitted to use 20/20 hindsight but must adopt the perspective of a reasonable police officer at the scene. *Id.* (citing *Graham*, 40 U.S. at 396-97). "The ultimate question is 'whether the totality of the circumstances justified a particular sort of search or seizure.'" *Bletz*, 641 F.3d at 751 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

When there are multiple instances of force used, the usual procedure in this circuit is to "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (internal

13

quotation marks omitted). We generally analyze each use of force distinctly, as it is the reasonableness of the search or seizure that is important, not the reasonableness of the police's actions in creating the circumstances that led to the search or seizure. *Bletz*, 641 F.3d at 752-53.

In this case, the district court divided its analysis into three segments: 1) the defendants' entry into the Jones's home without a warrant; 2) the defendants' use of a flash-bang device when entering the home; and 3) the defendants' use of deadly force against Jones.[3]

### 1.      Defendants' Use of the Flash-Bang Device

In formulating their plan of entry to apprehend Jones, Jose and Overmyer decided to use a flash-bang device in order to distract or confuse Jones, making it easier to arrest him. The district court held this use to be a distinct use of force subject to Fourth Amendment reasonableness analysis.

On appeal, defendants first argue that the use of the flash-bang device did not constitute a seizure, and thus, even though it was a use of force, is not subject to the Fourth Amendment because it did not terminate Jones's movement.[4] This contention lacks merit, however, as this court has previously analyzed the use of a flash-bang device as a use of force for Fourth Amendment

---

[3]As plaintiffs do not appeal the portion of the district court's opinion discussing defendants' warrantless entry into the Jones's home, that issue is not before us.

[4]The defendants also contend that, as neither Mario or Jose threw the flash-bang device, that use of force cannot be considered in determining whether they are entitled to qualified immunity. However, defendants did not present this argument to the district court. As it has been argued for the first time on appeal, this issue is not properly before us. *See Parsons v. City of Pontiac*, 533 F.3d 492, 505 (6th Cir. 2008) (declining to consider issue of state immunity when it was not raised at the district level); *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993) ("'[I]ssues not presented to the district court but raised for the first time on appeal are not properly before the court.'" (quoting *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1488 (6th Cir.1991)).

purposes. *See Ramage v. Louisville/Jefferson Cnty. Metro Gov't*, No. 11-5934, 2013 WL 1235652, at *4-5 (6th Cir. Mar. 28, 2013) (affirming district court's analysis of flash-bang device as reasonable use of force); *Bing*, 456 F.3d at 569-70 (analyzing police's use of two flash-bang devices); *Marmelshtein v. City of Southfield*, 421 F. App'x 596, 603 (6th Cir. 2011) (analyzing whether use of flash-bang device violated Fourth Amendment rights); *Graves v. Bowles*, 419 F. App'x 640, 643 (6th Cir. 2011) (finding use of flash-bang device in carrying out arrest to be reasonable use of force); *United States v. Dawkins*, 83 F. App'x 48, 51 (6th Cir. 2003) (finding use of a flash-bang device to be a reasonable use of force during review of a motion to suppress).

The district court denied summary judgment on the basis of qualified immunity as to the use of the flash-bang device because it found there were disputes of fact as to the reasonableness of Mario's and Jose's actions. *Jones*, 889 F. Supp. 2d at 1003. First, the court found there was a dispute of fact as to whether Jones was asleep or whether he may have been lying in wait for the police or someone else to enter the house. *Id.* Second, the district court found that there was a genuine issue of material fact as to whether defendants considered the alternatives to a forced entry as set forth in their training manual. *Id.* The district court noted that whether defendants were consistent with their own training manual was "a relevant consideration in determining the reasonableness of the steps taken to seize [Jones]." *Id.* Thus, the district court found that "a jury could determine a reasonable officer would have known the use of a flash-bang to enter the home was an unreasonable use of force." *Id.* Based on these factual questions, the district court denied summary judgment on qualified immunity grounds. In doing so, however, the district court did not

15

address whether any constitutional right violated by defendants' actions was "clearly established" at the time defendants deployed the flash-bang device.

In examining excessive force, "it is not enough that a plaintiff establishes that the defendant's use of force was excessive under the Fourth Amendment." *Livermore*, 476 F.3d at 403.

> [T]here is no doubt that [precedent] clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough . . . the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (internal quotation marks and citations omitted). In other words, "pre-existing law must 'dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances*.'" *Walker v. Davis*, 649 F.3d 502, 504 (6th Cir. 2011) (McKeague, J., dissenting) (quoting *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002)). The standard requires courts to examine the asserted right at a "relatively high level of specificity" on a case-by-case basis. *Bletz*, 641 F.3d at 750 (quoting *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997)). We look first to decisions of the Supreme Court, then to the decisions of this court and other courts within the circuit, and finally to the decisions of other circuits. *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991). "Ordinarily, a Supreme Court or Sixth Circuit decision on point is necessary." *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007).

16

In this case, the district court did not address whether Jones's right to not endure a flash-bang device was clearly established, regardless and independent of the factual disputes concerning the officers' reasonableness under the first prong of the *Pearson/Saucier* analysis, and neither party raised this issue in their briefs related to defendants' motion for summary judgment. Assuming use of the flash-bang device was unreasonable under the circumstances, the individual defendants would still be protected by qualified immunity if there was no case law indicating that their actions violated federal law. While defendants have presented this argument on appeal, "[i]t is a well-established rule that this Court will not consider claims that are presented for the first time on appeal nor arguments that are not properly raised below." *Berryman v. Rieger*, 150 F.3d 561, 568 (6th Cir. 1998) (refusing to analyze issue of qualified immunity when it was not presented to district court); *see also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012) (noting that "'[i]t is the general rule . . . that a federal appellate court does not consider an issue not passed upon below'" (alteration in original) (quoting *Katt v. Dykhouse*, 983 F.3d 690, 695 (6th Cir. 1992))); *McCoy v. Michigan*, 369 F. App'x 646, 653 (6th Cir. 2010) (declining to address merits of qualified immunity defense on appeal); *Foster*, 6 F.3d at 409 (refusing to address arguments not raised in the district court and acknowledging that one of the policies underlying the rule is the "increased ease 'accorded appellate review by having the district court first consider the issue'" (quoting *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 970 (10th Cir. 1991))). We recognize our discretion to consider the defendants' arguments on the merits in exceptional circumstances; however, we find that no such circumstances are present in this case, and conclude that the district court should hear argument from the parties and be given the opportunity to address this issue on remand. Accordingly, we reverse

17

the district court's opinion denying summary judgment as to the use of the flash-bang device and remand to the district court to determine whether, assuming Jones's right not to endure the use of a flash-bang device was violated, that right was clearly established in July 2010.

### 2. Use of Deadly Force

The district court ruled that qualified immunity at the summary judgment stage was also inappropriate as to Mario's and Jose's use of deadly force against Jones. The district court found that whether the police acted reasonably in using deadly force depended upon the resolution of several factual disputes, including whether Jones had time to comply with the orders of the TRT or heard the orders in the first place, given the impact of the flash-bang device and whether, when he raised his gun, Jones was doing so solely because he was startled and awoken by the flash-bang device. 889 F. Supp. 2d at 1004-05. On appeal, defendants argue that the district court erred because the factual disputes the court alluded to are not genuine and do not concern material facts.

The Supreme Court has established that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner*, 471 U.S. at 7. Such use of force is reasonable "only if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'" *Chappell*, 585 F.3d at 908 (quoting *Garner*, 471 U.S. at 7, 11); *see also Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public."). The use of deadly force is evaluated under the standard

18

of objective reasonableness, which "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances . . . ." *Simmonds*, 682 F.3d at 445 (quotation marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. At the summary judgment stage, after the relevant set of facts has been determined and all reasonable inferences are drawn in favor of the plaintiff, "the question whether the detectives' actions were objectively unreasonable is a pure question of law." *Chappell*, 585 F.3d at 909 (quoting *Scott*, 550 U.S. at 381 n.8). To make out a genuine issue of material fact to defeat qualified immunity, the plaintiff must present significant evidence tending to support his version of the facts. *Id.* (citation omitted).

Defendants contend that whether Jones was trying to comply with the commands of the officers, or whether he was merely involuntarily raising the gun after being awoken by the flash-bang device is irrelevant to whether the defendants perceived a threat of serious bodily harm. In determining whether the use of deadly force was justified, the relevant consideration "is whether a reasonable officer in [defendants]' shoes would have feared for his life, not what was in the mind of [the decedent] when he turned around with the gun in his hand." *Bell v. City of East Cleveland*, 125 F.3d 855, No. 96-3801, 1997 WL 640116, at \*3 (6th Cir. 1997) (table); *see Jones v. City of Cincinnati*, 507 F. App'x 463, 468-69 (6th Cir. 2012) (rejecting argument that whether decedent was resisting arrest or struggling to breathe created a genuine issue of material fact as to preclude qualified immunity). In *Chappell*, the district court, in denying summary judgment on the basis of

19

qualified immunity, "deemed it 'plausible' that [decedent] had not actually refused to drop the knife, but was attempting to comply with the detectives' commands." 585 F.3d at 912. The district court further found there was a lack of evidence indicating the decedent had sufficient time to comply with any orders. On review, this court held that plaintiff's speculation that the decedent had innocent intentions when he approached officers with the knife in his hand was not enough to overcome the threat perceived by the officers. *Id.* The court further held that:

> Although it may be fair to say there is no evidence that [decedent], in the unknown inner workings of his mind, had sufficient time to comply, the record shows that there was sufficient time for the detectives to make observations of [decedent]'s actions—actions that, viewed objectively, strongly indicated his intentions were not innocent and compliant, but defiant and hostile . . . . [T]he objective reasonableness of the detectives' conduct must be measured in light of what they actually observed in the circumstances confronting them, not in light of speculation that may arise with the benefit of hindsight.

*Id.* (internal citation omitted).

In this case, while explicitly acknowledging that all "the TRT members all testified they saw [Jones] move his shotgun," the district court proceeded to state "genuine issues of fact exist as to whether the TRT allowed [Jones] to comply with any orders they may have given him." *Jones*, 889 F. Supp. 2d at 1004. The latter does not itself create a genuine issue of material fact, however, because what Jones may have been thinking or perceiving is not a relevant fact in evaluating the defendants' use of force. As in *Chappell*, independent of how much time defendants may have given Jones to comply with their commands, there is evidence from three officers that they had time to observe the defendant move his weapon and point it in the direction of the TRT, "strongly indicat[ing] his intentions were not innocent and compliant, but defiant and hostile." 585 F.3d at

20

912. Similarly, the actual motivation behind Jones's act of lifting the gun in the direction of the defendants is irrelevant as to whether it was objectively reasonable for the officers to believe Jones was going to fire at the TRT members. Accordingly, under *Chappell*, it was error for the district court to find that whether Jones had time to comply or whether he was complying with their orders was material in denying qualified immunity to Mario and Jose.

Nevertheless, we affirm the district court, given several pieces of evidence that, when viewed collectively and under the totality of the circumstances, create a material question of fact as to whether Jones posed a serious, objective threat to the defendants. Unlike the defendant police officers in *Chappell*, who first discovered the decedent hiding in an upstairs closet and ordered him out, which he did before raising a knife in a threatening manner, here defendants confronted the previously-sleeping Jones soon after entering the home, meaning there was less time for the TRT members to assess the risk presented to them. Further, defendants confronted Jones only seconds after detonating a flash-bang device which, the parties later showed, produces an explosion of 175 decibels and a light flash of 6 to 8 million candelas. While the district court took this as evidence as to what Jones was able to see or hear, it also goes to what the officers were able to see and hear as they approached Jones's location on the couch, which is an appropriate consideration in determining the officers' reasonableness. In fact, at least one of the defendants noted the circumstances created by the flash-bang device during the subsequent investigation:

> MARIO: So, we came around the corner, and I'm tryin[g], I'm tryin[g] to find the subject, basically, because I mean, you know, peakin through the window and now you're in the house . . . and I see his body, I'm trying to concentrate on where's his weapon, where's his face, what's he doin [sic]; this and that, I lost sight of his face, as far as, what his expressions are or anything, because of the smoke, the flash/bang

21

> went off in real close proximity to him, and there, there was a lot of smoke in that room[.]
>
> . . . .
>
> I could hear barking orders from behind me. And I'm still trying to get my ears straight from the flash-bang, you know . . . you know I'm trying to get everything straight as far as hearing, but I could hear screaming coming from behind me identifying ourselves and saying type of words 'drop it; don't do it, don't do it, don't do it.' I know that was running through my mind. I couldn't swear that I was saying it, but it was running through my mind . . . .

(R. 39-5 at 10). Similarly, Karn stated that the smoke was still present and got worse as Mario and Jose fired shots at Jones while on the couch. Karn also stated that he could not see if Jones shouldered his weapon or had his finger on the trigger before Jose and Mario fired at him. This evidence goes beyond the "speculation" as to the impact of the flash-bang device rejected by this Court in *Whitlow v. City of Louisville*, 39 F. App'x 297, 307 (6th Cir. 2002) (noting that plaintiff had presented no evidence on whether the flash-bang device distracted decedent). Here, there is evidence in the record that the flash-bang device distracted or impaired both Jones and the TRT members. (R. 41-6 at 51 ("The flash-bang would cause momentary hearing loss and visual difficulties for the officers . . . making it difficult for tactical team members to see.")). Read in conjunction with testimony that gunfire occurred immediately after the detonation of the flash-bang device, the fact that the police had not made prior contact with Jones, and the evidence that Jones was asleep prior to the detonation of the flash-bang device, this evidence creates a genuine issue of material fact as to what threat the police perceived before they fired at Jones and, more importantly, whether that threat was reasonable.

22

Mario and Jose also challenge the fact that the district court did not address whether Jones's right to be free from deadly force was clearly established in these circumstances. The right to be free from deadly force when not posing a reasonable threat to others is clearly established in this circuit. *See Bletz*, 641 F.3d at 752 (citing *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006) (stating that the court has clearly established that a person has a "right not to be shot unless they are perceived as posing a threat to officers or others")). Although there may be no case law directly dealing with these factual circumstances, this case is "governed by the rule that 'general statements of the law are capable of giving clear and fair warning to officers even where the very action in question has not previously been held unlawful.'" *Walker*, 649 F.3d at 504 (quoting *Smith v. Cupp*, 430 F.3d 766, 776-77 (6th Cir. 2005)). Accordingly, we affirm, on different grounds, the district court's denial of qualified immunity as to the use of deadly force at the summary judgement stage.

### B.      Supervisory Liability

Overmyer also appeals the denial of summary judgment on plaintiffs' claim of supervisory liability. The district court held that both supervisory and municipality liability depended upon the availability of qualified immunity as to Mario and Jose.

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). A plaintiff must plead that each government official, through his own actions, has violated the Constitution. *Id.*

The Sixth Circuit, however, has held that a police officer can be liable for the conduct of other police officers when the officer supervises the individual who used excessive force. *Bletz*, 641

F.3d at 754. To be liable a supervisor must have "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)). "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays*, 668 F.2d at 874). It is well established that where there has been no constitutional violation, a supervisor cannot be liable for the acts of his subordinates. *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendant is established, the municipal defendants cannot be held liable under § 1983.").

With respect to plaintiffs' excessive force claim for use of the flash-bang device, if the district court concludes on remand that qualified immunity is available to Mario and Jose because Jones's right to not endure a flash-bang device was not clearly established, then the district court will also have to address whether qualified immunity is available to Overmyer, who has also asserted qualified immunity on appeal. We reverse this part of the district court's decision so that the district court may address the availability of qualified immunity for use of the flash-bang device as to Overmyer on remand.

Regarding the TRT's use of deadly force, we affirm the district court's denial of summary judgment to Overmyer because factual questions remain as to his planning, participation, and encouragement of the TRT members on the night of Jones's death. Specifically, the record is unclear as to whether Overmyer authorized or otherwise encouraged the use of deadly force to the

members of the TRT prior to their forced entry. It is undisputed that Overmyer formulated the plan that ultimately led to Jones's death and was in charge of the officers who carried out that plan. Were a jury to conclude that Overmyer either implicitly authorized or knowingly acquiesced to the use of deadly force against Jones when he presented no reasonable threat of death or serious bodily harm, then Overmyer could be liable for Jones's death. The district court concluded it could not properly make that determination and denied Overmyer's motion for summary judgment. We affirm that decision.

### C.      State Law Claims

The individual defendants argue that the district court improperly failed to grant summary judgment in their favor on plaintiffs' state claims based on the provisions of Ohio's immunity statute. Plaintiffs respond that the district court properly held factual disputes precluded summary judgment, or alternatively, that there are sufficient facts for a jury to find the individual defendants acted recklessly. We affirm the district court.

Ohio Revised Code § 2744.03(A)(6) provides immunity to employees of political subdivisions of Ohio except where: a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or c) civil liability is expressly imposed upon the employee by a section of the Revised Code. Under Ohio law "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 983 N.E. 2d 266, 273 (Ohio 2012) (citing *Thompson*

*v. McNeill*, 559 N.E. 2d 705, 708 (Ohio 1990)). "[W]anton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* (citing *Tighe v. Diamond*, 80 N.E. 2d 122, 128 (1948)).

We have previously held that the distinction between negligence and recklessness is better left for a jury rather than appellate judges. *See Chesher v. Neyer*, 477 F.3d 784, 804 (6th Cir. 2007) (citing *Whitfield v. Dayton*, 854 N.E.2d 532, 540 (Ohio Ct. App. 2006) ("[W]hether particular acts demonstrate the presence of wantonness, recklessness, or merely negligence is normally a decision for the jury, based on the totality of the circumstances.")). Given the presence of several remaining factual disputes, and in light of the circumstances of this case, the question of what actions the individual defendants took, as well as whether those acts were merely negligent or in fact reckless, is a question properly reserved for the jury. Accordingly, we affirm the district court's denial of summary judgment on state immunity grounds.

## V. CONCLUSION

For the reasons explained herein, we **REVERSE** the district court's denial of summary judgment as to use of a flash-bang device against Mario and Jose Calvillo and Sheriff Overmyer, **AFFIRM** the decision of the district court in all other respects, and **REMAND** this case to the district court for further proceedings consistent with this opinion.