NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0308n.06

Case Nos. 11-5934

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Mar 28, 2013*

DEBORAH S. HUNT, Clerk

| | |
|---|---|
| SHARON RAMAGE, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| LOUISVILLE/JEFFERSON COUNTY | ) |
| METRO GOVERNMENT, *et al.*, | ) |
| | ) |
| Defendants-Appellees. | ) |
| | ) |

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

Before: BATCHELDER, Chief Judge; GIBBONS, Circuit Judge; and ROSENTHAL, District Judge.[*]

ALICE M. BATCHELDER, Chief Judge. Sharon Ramage sued the Louisville/Jefferson County Metro Government ("City") and Det. Dan Jackman under 42 U.S.C. § 1983. The district court awarded summary judgment to Jackman and partial summary judgment to the City. A jury found for the City on the remaining claims. In this appeal, we DISMISS in part and AFFIRM in part.

**I.**

On June 21, 2007, some employees at a photo developing center in Louisville, Kentucky, discovered that some photos that had been dropped off for development contained images of a nude man with a nude child. They contacted Det. Dan Jackman of the Louisville Metro Police Department Crimes Against Children Unit. The name and address listed on the film were for Sharon

___

[*] The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

Ramage, and Det. Jackman was able to identify the man in the photos as Michael Ramage, Sharon's

adult son. Michael Ramage is a convicted felon who previously had been charged with 19 separate

crimes, including multiple drug and weapons violations, and convicted of at least some.[1] Michael

Ramage's driver's license and criminal records listed that same address as his primary residence.

Det. Jackman used this information to obtain a search warrant for the Ramage property.

Prior to execution of the search warrant, Det. Jackman's investigation of the property and its

residents revealed certain factors that placed the search in a high-risk category. The Ramage home

sits on a large piece of property (16 acres) set back from the road, and the road frontage is lined with

a four-foot iron fence and an iron gate at the driveway. Three separate buildings are located on the

property, at least one of which was secured with iron security doors. Det. Jackman anticipated that

Michael Ramage would be at home at the time of the search and noted that his prior criminal charges

involved weapons violations.

Det. Jackman prepared a Risk Assessment Matrix prior to obtaining the search warrant, in

accordance with standard office procedure. The matrix uses a point system to assess the level of risk

involved in executing a search or arrest warrant in a particular situation. The categories numerically

score the nature of the warrant, the target's criminal history, the level of surveillance and fortification

of the location, and the likelihood that firearms will be a threat to officer safety. Mainly because of

---

[1]The City lists Michael Ramage's previous charges in its brief, but does not include the disposition of those charges. The district court likewise listed only the charges, but not their dispositions. Det. Jackman testified that he obtained the information from CourtNet, which lists some of the dispositions but not all. Nevertheless, it is not disputed that Michael Ramage had been convicted of at least one felony, served time in prison, and had both drug and weapons charges on his record at the time of this incident.

Michael Ramage's criminal history and the "fortification" of the property (its size, the gate, and the security doors), this situation scored a 29 on the matrix. Any score over 25 automatically requires that, in order to ensure the safety of everyone involved, the investigator bring in a SWAT team to execute the warrant and secure the area before the investigative unit conducts the search.

At 9:30 p.m. on June 25, 2007, a SWAT team arrived at the Ramage residence to execute the warrant. Sharon Ramage was home alone doing laundry. Her oldest son, Tyler Ramage, was at home in "Building B" at the same address. The gate at the entrance of the driveway was open and the front door to the main house was unlocked, but the back door was locked. Before entering, a SWAT officer detonated a flash-bang device outside. The officers chose not to set off the flash-bang inside the home due to the possibility that children might be inside. Immediately following the flash-bang, the SWAT team entered through the front and back doors simultaneously, breaking in the back door. The team members entered with their guns drawn in a "ready position." This is general police practice during warrant service, not specific to SWAT, until an officer calls the location safe. Sharon Ramage, alarmed by the flash-bang, did not hear the SWAT team knock and announce before entering.[2] Team members approached her from multiple directions, physically seized her, spun her around, and handcuffed her in plastic ties. Sharon Ramage saw at least one gun pointed at her at this time. She remained handcuffed and was guarded for perhaps half an hour, although her testimony is somewhat unclear as to how much time passed. After the SWAT team finished securing the home, detectives, including Det. Jackman, entered the home and conducted the search.

---

[2]The question of whether the SWAT team violated the knock and announce rule went to trial, and the jury found for the defendant police department. The record of the trial is not before this court.

When the detectives had completed the search, Sharon Ramage was released. Although she had complained of injuries, she refused medical help and has not emphasized any injury sustained from her contact with the officers as part of her claim on appeal. The officers found neither Michael Ramage nor any incriminating evidence on the property, but an arrest warrant issued the next day and he was subsequently arrested. As part of a plea deal involving drug charges, the obscenity charge that formed the basis of the search warrant was dismissed.

Sharon Ramage filed this § 1983 action against the Louisville Metro Police Department (an arm of the City) and Det. Jackman,[3] alleging municipal and supervisory liability for the decision to use the SWAT team and the actions of the SWAT team, which she claimed violated her Fourth Amendment rights. The City removed the case to federal district court and both sides moved for summary judgment. The district court granted summary judgment to Det. Jackman and partial summary judgment to the City, and denied Ramage's motion. The remaining claims were tried to a jury, which entered a verdict for the City. Ramage appeals, challenging the jury instructions and claiming that the district court erred in granting the summary judgments to the defendants.

**II.**

The appellant, Sharon Ramage, has not ordered a transcript of the trial for this court to review. On the transcript order form filed with this court, she indicated that a transcript was not necessary for purposes of this appeal. In response to the City's claim that Ramage had not objected to the jury instructions, Ramage ordered a one-page excerpt from the trial transcript demonstrating

---

[3]Ramage initially listed several other detectives as defendants, but they were dismissed from the suit by stipulation on March 2, 2010. No members of the SWAT team were ever party to this suit.

that her objections had been preserved for appeal. This excerpt does not include the actual instructions tendered to the jury nor does it include any of the evidence presented at trial.

It is the appellant's duty to order the trial transcript when it is necessary to a review of the issues she raises for appeal. Fed. R. App. P. 10(b). Ramage has therefore waived review of her claim that the jury instructions were improper. *See Coleman v. Shoney's, Inc.*, 79 F. App'x 155, 157 (6th Cir. 2003) (citing *Hawley v. City of Cleveland*, 24 F.3d 814, 821 (6th Cir. 1994)); *Foster v. ANR Pipeline Co.*, 41 F. App'x 802, 804 (6th Cir. 2002) ("[T]o the extent that Foster challenges the . . . jury instructions during trial, the district court's judgment must be affirmed because Foster has not provided the trial transcript[.]"); *Herndon v. City of Massillon*, 638 F.2d 963, 965 (6th Cir. 1981); *King v. Carmichael*, 268 F.2d 305, 306 (6th Cir. 1959) ("On the transcript order form they filed with this court, the plaintiffs . . . indicated that a transcript was 'unnecessary for appeal purposes.' . . . Under these circumstances, the plaintiffs have waived review of their claims.").

We dismiss the claims concerning the jury instructions. The other claims that Ramage raises on appeal were decided on summary judgment and are unaffected by the lack of a trial transcript.

**III.**

We review *de novo* a district court's grant of summary judgment. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Under Federal Rule of Civil Procedure 56(a), summary judgment is proper if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." We review the facts and evidence in the light most favorable to the nonmoving party. *Warf v. Bd. of Elections*, 619 F.3d 553, 558 (6th Cir. 2010).

Ramage claims that the City is liable under *Monell*'s doctrine of municipal liability. Under

*Monell*, an injured plaintiff can sue a local government directly for the unconstitutional actions of

its employees when those actions are taken pursuant to a policy or custom of the governing body.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-691 (1978).

> Municipal liability attaches only where the decision-maker possesses final authority
> to establish municipal policy with respect to the action ordered. The fact that a
> particular official — even a policymaking official — has discretion in the exercise
> of particular functions does not, without more, give rise to municipal liability based
> on an exercise of that discretion.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986) (footnote omitted). The City is

therefore liable only if the allegedly unconstitutional actions were taken pursuant to City policy. Det.

Jackman testified that in using the matrix and deciding to bring in SWAT based on its outcome, he

was following police department policy. It is less clear, however, whether the SWAT team

members' specific actions in executing the warrant were also conducted according to LMPD policy.

SWAT commander Lt. Cobaugh indicated that although SWAT almost always follows this approach

when executing a warrant, each situation is examined on a case-by-case basis to determine which

tactics are appropriate. The district court examined the constitutionality of each action.

## A. Use of the Risk Assessment Matrix

Ramage argues that use of the matrix to decide when to bring in the SWAT team to execute

a search warrant violates the Fourth Amendment because it is based on a numerical calculation rather

than an individualized assessment of the totality of the circumstances. The district court disagreed,

holding: "[T]he matrix is the embodiment of making a case by case decision based on the

6

individualized circumstances of the search warrant to be executed." Ramage has not given any reasons why the police cannot systematize their decision-making in this manner.

This court has never directly addressed this issue before, nor does it appear that any other federal court has done so. In *Whitlow v. City of Louisville*, 39 F. App'x 297, 307 n.1 (6th Cir. 2002), which involved similar facts with respect to the completion of a Risk Assessment Matrix prior to execution of a search warrant by a SWAT team, we held that the use of the matrix without additional investigation into the context of the factors was at worst negligence, which did not support municipal liability. We never suggested that the use of a matrix could be per se unconstitutional. Based on this precedent, we find no error in the use of the matrix here.

## B. Decision to Deploy the SWAT Team

Ramage argues that the use of a SWAT team to execute a search warrant at her home was excessive force. Excessive force claims are assessed under the Fourth Amendment reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The actions must be examined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The relevant facts for this analysis are those that the detectives knew when they made the decision to use the SWAT team for the warrant service, not the situation the SWAT team found when it actually entered the property. The district court found that the decision was reasonable.

From Michael Ramage's driver's license and court records, the detectives had reason to expect that he would be on the property; from his criminal history, they reasonably anticipated that he might be armed. This created substantial risk for the officers executing the warrant. Also, the

7

security features at the property (fences, gate, security doors, etc.) necessitated the SWAT team's use

of their tools and training. Although the officers had no way of knowing that the gate and front door

would be open, they did know that they would need enough manpower to secure three separate and

fortified buildings. Given these factors, we agree with the district court's conclusion that "simply

bringing along the SWAT team [did] not create liability for the LMPD."

### C. The SWAT Team's Actions

Ramage argues that three separate actions of the SWAT team constituted excessive force for

which the City should be liable: the detonation of the flash-bang, the breach of the back door, and

her detention during the search. Her claims must be subjected to a balancing test to weigh "the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the

importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471

U.S. 1, 8 (1985) (quotation marks omitted). The district court approved each of these actions.

Flash-bangs are explosive devices that create a bright flash and a simultaneous loud bang.

When used properly they cause minimal damage and officers use them to stun or distract the

occupants of a home and keep them from creating a safety threat. We have never held the use of a

flash-bang to be excessive force, though we and other courts have expressed concern regarding their

use. *See, e.g.*, *United States v. Dawkins*, 83 F. App'x 48, 51 (6th Cir. 2003) ("The court is mindful

that the use of flash-bang devices will be inappropriate in many cases."); *Molina v. Cooper*, 325 F.3d

963, 973 n.7 (7th Cir. 2003) (noting the lack of cases finding use of a flash-bang to be excessive

force); *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997) ("The use of a 'flash-bang' device

in a house where innocent and unsuspecting children sleep gives us great pause."). Other courts have held the use of a flash-bang to be excessive force when the police showed clear disregard for the safety of the occupants of the home. *See Estate of Escobedo v. Bender*, 600 F.3d 770, 784-86 (7th Cir. 2010) (finding excessive force where police threw flash-bang devices into rooms without first visually inspecting for people); *Estate of Smith v. Morasco*, 430 F.3d 140, 151 (3d Cir. 2005) (holding that police used excessive force when they detonated flash-bangs despite knowing that the target had a heart condition and various other health problems); *Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004) (discussing a situation in which police "throw it 'blind' into a room occupied by innocent bystanders").

As the district court held, the SWAT officers' use of the flash-bang prior to entering the Ramage home would not be unreasonable in light of these cases. Ramage does not contend that she has any serious medical conditions that could have been aggravated by the startling noise. Furthermore, the SWAT team detonated the device *outside* so as to pose minimum risk to persons and property *inside* the house. We conclude that the use of the flash-bang was reasonable here.

Ramage next argues that it was unreasonable for the SWAT team to enter through both the front and back doors when the back door was locked and the front door was not. The SWAT team breached the back door in this situation according to SWAT's general practice of entering through more than one door. Notwithstanding Ramage's argument, the district court explained:

> [I]t makes sense to secure all entrances and exits to the building. Entering the building from both points could provide more officers in more locations to ensure safety. Without [SWAT team members] entering through the back door, individuals in the home could have surprised officers as they entered from the front.

We agree with the district court that this was a reasonable action.

Finally, Ramage argues that the SWAT team members used excessive force by seizing her, carrying and displaying their guns, forcing her to the ground, and cuffing her hands behind her back. While hindsight may show that these actions were unnecessary, the officers' actions are not judged in hindsight, but by whether they were objectively reasonable at the time. The officers were within constitutional bounds to detain Ramage while the search was taking place. *Michigan v. Summers*, 452 U.S. 692, 705 (1981). "Inherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Muehler v. Mena*, 544 U.S. 93, 98-99 (2005). As the district court explained, the facts of *Muehler* itself preclude Ramage's claim: a woman, sleeping in her bed when the SWAT team arrived, was awaked, placed in handcuffs at gunpoint, and guarded — while handcuffed — throughout the duration of the search. *Id*. at 96. This was held to be "plainly permissible" under the Fourth Amendment. *Id.* at 98.

Second, as the district court explained, it is inaccurate to say that Ramage was "detained at gunpoint." Although she claimed the officers had their guns pointed at her for five to ten minutes, this is inconsistent with the rest of her testimony:

> A.    . . . I just remember being grabbed from both sides, and at the same time somebody had a shield running in — or whatever this thing was they had in their hand — and I seen [sic] a gun. That's all I know. And the gun was pointed at me, and I remember hollering, I have no guns, I have no weapons.
>
> Q.    And you're grabbed?
>
> A.    Yes, ma'am.
>
> Q.    You're turned around?
>
> A.    I'm slammed around.

10

Q.      Okay. And at this point when you're slammed around, do you know where the gun is pointing?

A.      No, ma'am.

Q.      Because you can't see it?

A.      I can't see it.

Q.      Do you ever see the gun again?

A.      No ma'am.

Q.      Okay. So  it is pointed at you for how ever long it takes for these two people to grab you and slam you around?

A.      And subdue me, yes.

This does not demonstrate excessive force.  *See, e.g.*, *Dunigan v. Noble*, 390 F.3d 486 (6th Cir. 2004) (finding no excessive force when an officer pushed the arrestee's mother toward a K-9 dog which then bit her); *McColman v. St. Clair County*, 479 F. App'x 1, 1 (6th Cir. 2012) (finding no excessive force when an officer shoved a handcuffed double-amputee across the back seat of his car, causing one of her prosthetic legs to fall off, so that she lost her balance and was knocked unconscious during a sharp turn).  Excessive force entails a more extreme unreasonableness.  *See, e.g.*, *Pershell v. Cook*, 430 F. App'x 410, 415 (6th Cir. 2011) (finding excessive force where officers performed a leg sweep, handcuffed the plaintiff when he was on the ground, and kicked or hit him while he was on the ground causing injuries and unconsciousness).

## D.  Supervisory Liability

Det. Jackman could be held liable under supervisory liability only if the actions of the SWAT team were unconstitutional.  *See Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998).

11

Given that they were not, this claim has no merit. But even if the SWAT team violated Ramage's

Fourth Amendment rights, she still cannot prove supervisory liability under § 1983 here.

> This court has held that § 1983 liability must be based on more than respondeat
> superior . . . . Thus, a supervisory official's failure to supervise, control or train the
> offending individual is not actionable unless the supervisor 'either encouraged the
> specific incident of misconduct or in some other way directly participated in it. . . .
> [A] plaintiff must show that the official at least implicitly authorized, approved, or
> knowingly acquiesced in the unconstitutional conduct of the offending officers.'

*Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d

869, 874 (6th Cir. 1982)). Aside from the initial decision to bring in the SWAT team, Det. Jackman

had no control over the specific actions of the officers. He was not present when they secured the

Ramage home and he did not instruct them as to the level of force they should employ. Det.

Jackman had no reason to think that they would use excessive force.

### IV.

For the foregoing reasons, we **DISMISS** Ramage's appeal regarding the jury instructions and

**AFFIRM** the judgment of the district court regarding the grant of summary judgment.