RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0343p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JACOB GLENN BLANKENSHIP, as an individual,

*Plaintiff-Appellant*,

*v.*

> No. 25-5014

LOUISVILLE-JEFFERSON COUNTY, KENTUCKY METRO GOVERNMENT; ELLIOTT YOUNG, in his individual capacity and acting as a Trooper/Officer for the Kentucky State Police,

*Defendants-Appellees*.

─────────────

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:23-cv-00235—Rebecca Grady Jennings, District Judge.

Argued:  October 21, 2025

Decided and Filed:  December 16, 2025

Before: MOORE, CLAY, and WHITE, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:**  David J. Markese, AMERICAN LIBERTIES INSTITUTE, Orlando, Florida, for Appellant.  Bruce B. Paul, MCBRAYER PLLC, Louisville, Kentucky, for Appellee Louisville-Jefferson County, Kentucky Metro Government.  Brenn O. Combs, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellee Elliott Young.  **ON BRIEF:**  David J. Markese, AMERICAN LIBERTIES INSTITUTE, Orlando, Florida, for Appellant.  Bruce B. Paul, William G. Carroll, MCBRAYER PLLC, Louisville, Kentucky, for Appellee Louisville-Jefferson County, Kentucky Metro Government.  Brenn O. Combs, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellee Elliott Young.

---

**OPINION**

---

CLAY, Circuit Judge.   Plaintiff Jacob Blankenship appeals the district court's grant of summary judgment to Defendants Louisville-Jefferson County, Kentucky Metro Government and Elliott Young.   At summary judgment, the district court dismissed Plaintiff's free speech, free exercise, and due process claims against both Defendants.   The district court also dismissed Plaintiff's *Monell* municipal liability claim against Defendant Louisville-Jefferson County, Kentucky Metro Government and granted qualified immunity to Defendant Elliott Young. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I.  BACKGROUND

### A.  Factual Background

In advance of the Kentucky Derby in 2022, Churchill Downs Racetrack, LLC ("Churchill Downs") submitted a "Special Event Permit Application" to Defendant Louisville-Jefferson County, Kentucky Metro Government ("Metro").   *See* Permit Appl., R. 55-3.   The application described the event as the "148th running of the Kentucky Derby and Kentucky Oaks, two of the most famous horse races in North America."   Permit Appl., R. 55-3, Page ID #481.   The application provided that, in seeking a permit, Churchill Downs "has accounted for perimeter and event security," along with "traffic control and access" to "protect the venue and spectators attending the events."   *Id.* at 487.   As part of the "traffic control plan," the application requested "street closures" and "restricted access" in several areas around the event at Churchill Downs, including along Central Avenue from Taylor Boulevard to Floyd Street.   *Id.* at 491.   The application also requested temporary fencing along Central Avenue from Taylor Boulevard to Floyd Street.   The application stated that the sidewalk on Central Avenue closest to Churchill Downs would "be restricted to ticket holder access only" from Fourth Street to Ninth Street, and guests "may be required to show [a] valid ticket at a designated checkpoint."   *Id.* at 498.   The application also planned on private security and law enforcement, including Kentucky State Police, offering support during the event.

In April 2022, Metro approved Churchill Downs's application and issued an "Event Permit." *See* Event Permit, R. 52-2, Page ID #266–67. The permit authorized "restricted access" from May 4 to May 7, 2022 in several areas around Churchill Downs, including along Central Avenue between Taylor Boulevard and Floyd Street. *Id.* at 266. The permit also reflected multiple "street closures," including along Central Avenue between Taylor Boulevard and Floyd Street. *Id.* at 267.

Within that restricted area along Central Avenue, at the intersection of Central Avenue and Third Street, Churchill Downs placed two signs that both read:

NO TRESPASSING

VALID CREDENTIALS ONLY
BEYOND THIS POINT

CONSENT TO SEARCH OF
PROPERTY OR PERSON
BEFORE ENTERING

R. 52-5, Page ID #287. According to the security director for Churchill Downs, Josh Ball ("Ball"), a member of the public would need either a ticket or valid credentials to walk beyond the signs. According to the special events manager for Metro, Churchill Downs retained the authority to establish a ticket requirement anywhere within the restricted area. State Police leadership also understood that the permit allowed Churchill Downs the authority "to limit access." Johnson Dep., R. 55-7, Page ID #535. But as stated by the special events manager for Metro, the permit did not allow Churchill Downs to take any action that is "not allowed by established law." Sweeney Dep., R. 59-3, Page ID #873.

On May 7, 2022, Plaintiff Jacob Blankenship ("Blankenship") gathered with a group in a parking lot near Churchill Downs. Blankenship and the group began walking towards Churchill Downs with signs, flags, megaphones, cameras, and other equipment. Blankenship and the group encountered the temporary fence along Central Avenue and then walked through a tunnel under Central Avenue. After exiting the tunnel, they crossed Third Street, walked beyond the "NO TRESPASSING" signs, and entered the fenced-in area. Blankenship and the group then

walked along Central Avenue between Third Street and Fourth Street, where they stopped to engage with patrons of the Kentucky Derby by demonstrating with signs, distributing literature, and using sound equipment to preach. Blankenship does not claim that he or any member of his group had a ticket or other credentials for the event.

After several minutes, a security guard approached Blankenship and the group and stated, "Y'all gotta go . . . you're trespassing." Video, R. 62, 13:08:35–13:08:40.[1] A member of Blankenship's group began a conversation with the security guard, and Blankenship later stated, "Hey, hey don't even argue with them . . . they are security guards," and continued preaching. *Id.* at 13:09:34–13:09:42. A second security guard joined the conversation and stated to the group: "You can go on the other side all you want." *Id.* at 13:10:35–13:10:39. Both security guards stepped away from the conversation and remained nearby while the preaching continued.

Blankenship spoke with another member of the group, Joseph Estephane ("Estephane"). Blankenship stated, "This is a sidewalk, and this is a right-of-way, so we don't have to listen to them . . . Don't even entertain them. They're not cops." *Id.* at 13:11:29–13:11:35. Estephane responded, "Yesterday, I had state troopers threaten me with trespassing." *Id.* at 13:11:39–13:11:41. And Blankenship then stated, "I'll talk to them when they get here." *Id.* at 13:11:42–13:11:43. As the preaching continued, Blankenship stated, "Just ignore that guy. I'm not listening to anybody but the cops. Okay. I don't care what this guy says." Video, R. 62, 13:36:00–13:35:06. Blankenship additionally stated, "I don't move for anybody. Unless a cop directly threatens me to move, I'm not moving." *Id.* at 13:39:00–13:39:04.

Later, as Blankenship himself preached on the megaphone, a woman and Blankenship got into a physical altercation, in which they both appeared to hit each other, and the woman fell to the ground. Blankenship stated on the megaphone, "Hey cops! She just assaulted me right there." *Id.* at 14:04:34.

Ball, the security director for Churchill Downs, eventually contacted the commanding officer of Kentucky State Police, Major Matt Johnson ("Johnson"), and requested that Kentucky

---

[1]Blankenship wore a bodycam, which recorded a video of the events on that day. The citations to this video (R. 62) reference the time stamp in the bottom middle of the frame.

State Police come to Central Avenue and Fourth Street because "there were several groups of personnel within the permitted restricted areas that were refusing to leave." Johnson Dep., R. 55-7, Page ID #555. In that conversation, Johnson confirmed with Ball that Churchill Downs staff had already told the groups to leave the restricted area and they did not comply. When Johnson arrived, Churchill Downs security pointed out Blankenship and his group to Johnson and confirmed that they had already been instructed to leave. Johnson called for additional police officers to join him. Johnson stated his understanding of the situation: "[I]t's a private event on private property for the purposes of this [event] . . . And if the owner of said property tells someone, you're not allowed to be here, you need to leave the property, and they refuse. At that point, they're trespassing." *Id.* at 557–58.

Approximately one hour after Churchill Downs security told Blankenship and his group to leave, Kentucky State Police troopers, including Defendant Trooper Elliot Young, gathered at the scene. At that time, Ball spoke with Blankenship and his group and asked them to leave. Young understood that Blankenship and his group were "approached by security and told that they were trespassing and that that they had to go, and [they] continued remaining there unlawfully." Young Dep., R. 55-2, Page ID #391. Young further understood that Blankenship and his group were not allowed beyond the "NO TRESPASSING" signs without proper credentials.

After observing Blankenship and the group, the Kentucky State Police troopers approached and detained Estephane. A trooper announced, "You're trespassing. You can leave now, or you go to jail." Video, R. 62, 14:18:28–14:18:31. Another trooper stated, "You have been warned multiple times . . . You can leave or you're gonna go like him," gesturing to Estephane. *Id.* at 14:18:32–14:18:38. That trooper also told Blankenship, "This is not public," *id.* at 14:18:42, and as Blankenship argued with the trooper, the trooper stated, "This is Churchill Downs. You have been warned to leave . . . You can go ahead and leave," *id.* at 14:18:46–4:18:48. Despite stating that he would leave, Blankenship continued to argue with the troopers. Blankenship repeatedly claimed that he was never warned to leave. As Blankenship remained, the other members of the group moved to another location and continued preaching.

Defendant Young then arrested Blankenship. Defendant Young stated that he made that decision because Blankenship "was remaining unlawfully on the premises after having been told numerous times to vacate and refusing to do so." Young Dep., R. 55-2, 407–08. Blankenship testified that no Metro representatives were involved in his arrest. Blankenship was cited for third-degree criminal trespass with Young as the charging officer. *See* Ky. Rev. Stat. § 511.080 ("A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises."). Blankenship's criminal trespassing charge was dismissed without prejudice, provided that he has no unlawful contact with Churchill Downs.

## B. Procedural History

On May 8, 2023, Plaintiff filed a complaint in the United States District Court for the Western District of Kentucky, bringing free speech, free exercise, and due process claims under 42 U.S.C. § 1983 against Defendant Metro and Defendant Young ("Defendants"), in addition to a false arrest claim against Defendant Young. On March 21, 2024, the district court granted Defendant Young's motion to dismiss the false arrest claim and all claims against Defendant Young in his official capacity.[2]

On September 3, 2024, all three parties moved for summary judgment. On December 6, 2024, the district court denied Plaintiff's motion for summary judgment in full and granted Defendant Metro's and Defendant Young's motions for summary judgment in full. As to Plaintiff's free speech claim, the district court held that although it was unclear whether Plaintiff's arrest occurred in a traditional or limited public forum, in any event, the challenged restriction was content-neutral and survived intermediate scrutiny. As to Plaintiff's free exercise claim, the district court held that the challenged restriction affected Plaintiff's preaching only incidentally and no differently than non-religious conduct. As to Plaintiff's due process claim, the district court held that Plaintiff had not asserted any property or liberty interest and was not subjected to the law that he challenges. The district court then held that, because Plaintiff's rights were not violated, Metro has no municipal liability under *Monell*. Additionally, the district court held that, because Plaintiff's rights were not violated and because Defendant Young

---

[2]Plaintiff does not challenge on appeal the district court's dismissal of his false arrest claim.

had probable cause to arrest Plaintiff, Defendant Young is entitled to qualified immunity on all of Plaintiff's claims against Defendant Young in his individual capacity. This appeal followed, challenging the district court's grant of summary judgment to Defendants.

## II. DISCUSSION

### A. Standard of Review

We review the district court's grant of summary judgment *de novo*. *Kubala v. Smith*, 984 F.3d 1132, 1137 (6th Cir. 2021). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). "In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the nonmoving party." *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### B. Free Speech Claim

Plaintiff appeals the district court's grant of summary judgment to Defendants on his free speech claim under the First Amendment. The First Amendment "protects the right to be free from government abridgment of speech." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009). "Free-speech claims require a three-step inquiry: first, we determine whether the speech at issue is afforded constitutional protection; second, we examine the nature of the forum where the speech was made; and third, we assess whether the government's action in shutting off the speech was legitimate, in light of the applicable standard of review." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 242 (6th Cir. 2015) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

#### 1. Protected Speech

The parties do not dispute that the First Amendment protects Plaintiff's conduct. By distributing literature, displaying signs, preaching, and engaging in conversation with patrons of the Kentucky Derby, Plaintiff engaged in protected speech. *See Parks v. City of Columbus*, 395 F.3d 643, 647–48 (6th Cir. 2005) (holding that the plaintiff "by distributing literature, displaying

a religious message, and preaching" engaged in activity "that has been recognized as protected speech under the First Amendment").

## 2. Nature of the Forum

The forum at issue is the restricted area around the Kentucky Derby, along Central Avenue, where Plaintiff engaged in protected conduct and was arrested. Traditionally, "public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988) (citations omitted). However, "there have been limited circumstances" where a public street or sidewalk does not constitute a traditional public forum. *Parks*, 395 F.3d at 648.

For example, the Supreme Court has recognized "significant differences" between a typical public street and fairgrounds that include streets. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981). While a street is "continually open, often uncongested, and constitutes . . . a necessary conduit in the daily affairs of a locality's citizens," a fair "is a temporary event attracting a great number of visitors . . . for a short period to see" certain attractions, and the "flow of the crowd and demands of safety are more pressing." *Id.* Similar to a fair, the Kentucky Derby occurs for a temporary period to showcase horse races for a large number of spectators. *See id.* at 655 ("The Minnesota State Fair is a limited public forum in that it exists to provide a means for a great number of exhibitors temporarily to present . . . to a large number of people in an efficient fashion."). Although the restricted area around the Kentucky Derby included streets and sidewalks, the area "is more akin to a fair than a normal city street" for the duration of the event. *See Spingola v. Vill. of Granville*, 39 F. App'x 978, 983 (6th Cir. 2002) (concluding that a festival area "comprised of public streets" does not serve "in that function during the festival").

Moreover, the restricted area was not open to the public. The permit established "restricted access" along Central Avenue between Taylor Boulevard and Floyd Street, and the street was subject to closure during the event. Event Permit, R. 52-2, Page ID #266–67. Although it was physically possible for people to walk inside the restricted area without a ticket, the fencing surrounding the restricted area and the "NO TRESPASSING" signs reflected that the

area was closed from public access.  *See Hartman v. Thompson*, 931 F.3d 471, 479 (6th Cir. 2019) (holding that fairgrounds constituted a limited public forum because the "public cannot access the [f]airgrounds unless they pay admission").  The Kentucky Derby itself is a private event and is not "free and open to the public."  *Cf. Parks*, 395 F.3d at 652 (holding that an arts festival constituted a traditional public forum where the event occurred on city streets, "was not a private event," and "remained free and open to the public").  Under these circumstances, the restricted area constituted a limited public forum.

Plaintiff argues that the restricted area is a traditional public forum because Metro's permit was not exclusive.  In support of this argument, Plaintiff highlights only distinguishable cases.  In *Parks v. City of Columbus*, this Court held that a festival area constituted a traditional public forum "notwithstanding" a non-exclusive permit because the festival, unlike the Kentucky Derby, "remained free and open to the public."  *See* 395 F.3d at 652.  In *Sistrunk v. City of Strongsville*, this Court held that a city may issue a permit to a group "seeking to make exclusive use of [a public area] for expressive activity during a limited period of time," and the group may "exercise its free speech rights and autonomy over the content of its own message."  99 F.3d 194, 198, 200 (6th Cir. 1996).  Unlike the permittee in *Sistrunk*, however, Churchill Downs used the restricted area for horse races, not expressive activity, and did not seek to exclude Plaintiff from the content of any message of its own.  Moreover, *Sistrunk* does not support Plaintiff's position; rather, it confirms the constitutionality of a city providing a permit that temporarily closes a public forum for a private event.  Here, Defendant Metro similarly permitted a private event that temporarily closed a public forum.  In fact, the permit in this case raises even less constitutional concern than the permit in *Sistrunk* because it authorized Churchill Downs to exclude only those without tickets or credentials, not dissenters.  Additionally, in *Parks v. Finan*, this Court struck down a permitting scheme that required an individual to obtain a permit before speaking on Capitol grounds.  *See* 385 F.3d 694, 696–698 (6th Cir. 2004).  But Churchill Downs required that an individual have a ticket or other credentials to enter the immediate area surrounding the Kentucky Derby, not that an individual obtain permission before speaking.  Not only are these cases distinguishable, but Plaintiff also fails to point to a case in this Circuit that demonstrates that the nature of the forum depends on the exclusivity of the permit.

Plaintiff next argues that the restricted area is a traditional public forum because the location of his arrest was not ticketed and the public could enter the area freely. At the time of his arrest, Plaintiff was located along Central Avenue inside of the restricted area, within the fencing, and beyond the "NO TRESPASSING" signs. Although Churchill Downs staff may not have checked for tickets precisely at the location of Plaintiff's arrest, the street was closed from the public for the duration of the Kentucky Derby, and the posted signs reflected the street closure. Further, the Kentucky Derby was a ticketed event, and the record shows that Churchill Downs retained the authority to limit access, including impose a ticketing requirement, anywhere within the restricted area around the event. Since Churchill Downs retained the authority to limit access in the location of Plaintiff's arrest and took steps to close that location off from the public, the record does not support Plaintiff's second argument.

In any event, regardless of whether the restricted area constitutes a traditional public forum or a limited public forum, we examine the enforcement of the restricted area, as a content-neutral restriction, under the same level of intermediate scrutiny. *See Spingola*, 39 F. App'x at 983. "The government may enforce content-neutral time, place, and manner regulations if they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Id.*

### 3. Intermediate Scrutiny

#### a. Not Content-Based

"Government regulations of speech are content neutral if they are 'justified without reference to the content or viewpoint of the regulated speech.'" *Saieg v. City of Dearborn*, 641 F.3d 727, 735 (6th Cir. 2011) (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 696 (2010)). "The government's purpose is the controlling consideration." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Defendants justify Plaintiff's arrest and removal "without reference to the content or viewpoint of" Plaintiff's speech. *See Saieg*, 641 F.3d at 735. Plaintiff remained within the restricted area despite receiving multiple warnings to leave from both Churchill Downs security and Kentucky State Police troopers. A security guard for Churchill Downs initially told Plaintiff

to leave because he was "trespassing." Video, R. 62, 13:08:35–13:08:40. Later, after the state troopers allowed Plaintiff a final opportunity to leave, Young made the decision to arrest Plaintiff because Plaintiff "was remaining unlawfully on the premises after having been told numerous times to vacate and refusing to do so." Young Dep., R. 55-2, Page ID #407–08. Johnson, the commanding officer of Kentucky State Police, stated his understanding of the situation: "[I]t's a private event on private property for the purposes of this [event] . . . And if the owner of said property tells someone, you're not allowed to be here, you need to leave the property, and they refuse. At that point, they're trespassing." Johnson Dep., R. 55-7, Page ID #557–58. The basis for Plaintiff's arrest was a criminal trespass law. *See* Ky. Rev. Stat. § 511.080 ("A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises."). Plaintiff does not claim that he had any tickets or credentials for the event. Plaintiff offers no evidence to demonstrate that his arrest had any other basis besides his continued unauthorized presence in a restricted area. *See Reform Am. v. City of Detroit*, 37 F.4th 1138, 1149 (6th Cir. 2022) (holding that there is "no genuine dispute that the group's lack of tickets was the true basis for the officers' denial of its entry into the restricted area" because "there is no evidence that officers somehow used the group's lack of tickets as an ostensibly content-neutral pretext to deny its members entry when the real reason was the group's message" (citations omitted)).

As further evidence of content-neutrality, Churchill Downs sought removal of multiple groups, not just Plaintiff's group, because they all were unauthorized to remain in the restricted area. Ball, the security director for Churchill Downs, requested that Kentucky State Police come to the area because "there were several groups of personnel within the restricted areas that were refusing to leave." Johnson Dep., R. 55-7, Page ID #555. Those other groups did not share Plaintiff's message. *See Reform Am.*, 37 F.4th at 1149 (holding that "there is no genuine dispute that defendants' enforcement of the restricted area was ideologically evenhanded" where they "turned away all uncredentialed protestors" (cleaned up)). To this point, at oral argument, Plaintiff argued that the enforcement of the restricted area was not content-neutral because a t-shirt vendor remained within the restricted area without facing any consequences. However, Plaintiff did not mention a t-shirt vendor in his motion for summary judgment at the district court

or in his brief on appeal. Moreover, it is not apparent to this Court where it shows in the record, including in Plaintiff's bodycam footage, that Churchill Downs security and the Kentucky State Police allowed a t-shirt vendor to remain within the restricted area while they asked Plaintiff to leave that same location. Even if Churchill Downs had allowed a t-shirt vendor to remain within the restricted area, there is no indication that the t-shirt vendor was not authorized to be in the restricted area and lacked the proper ticket or credentials to remain at the event. Additionally, at oral argument, Plaintiff argued that Estephane was allowed to remain within the restricted area without facing any consequences on the day before Plaintiff preached. But that statement is also unsupported by the record, as Estephane stated in Plaintiff's own bodycam footage, "Yesterday, I had state troopers threaten me with trespassing." Video, R. 62, 13:11:39–13:11:41. Therefore, the record demonstrates not that the restricted area was selectively enforced but that multiple groups with different messages, including Plaintiff's group, were instructed to leave.

Plaintiff argues, "Metro's censorship, instilled in the permitting process, empowers a permittee unbridled discretion to exclude disfavored people and speech from the confines of the permitted space. In turn, Churchill Downs exercised this privilege to expel Blankenship due to the content of his message." Appellant's Br. at 33. But the permit did not provide Churchill Downs unbridled discretion to exclude disfavored people because of their speech. The permit did not allow Churchill Downs to take any action that is "not allowed by established law." Sweeney Dep., R. 59-3, Page ID #873. To be sure, Louisville-Jefferson Metro's Code of Ordinances ("Metro's Code") provides: "A permitee shall comply with all terms and conditions set forth in a permit, with the provisions of this chapter, and with all other applicable laws and ordinances." LOUISVILLE-JEFFERSON, KY., CODE OF ORDINANCES § 100.08. Metro thus did not empower Churchill Downs with unfettered discretion to remove people, such as Plaintiff, because of the content of their message.

Plaintiff also suggests that the ticketing requirement was not the actual basis for his arrest because Plaintiff encountered no check for tickets prior to his arrest. But Young testified that he believed Plaintiff "did not have the valid credentials to remain" in the restricted area because Plaintiff "did not present [Young] with any valid credentials." Young Dep., R. 55-2, Page ID #391. This assumption that Plaintiff did not have a ticket for the event was reasonable because

Plaintiff offered no indication to Churchill Downs staff or the Kentucky State Police that he did in fact have a ticket. Rather, Plaintiff repeatedly claimed that he had a right to stand in the restricted area because the area was open to the public. In response to Churchill Downs staff's initial instruction to leave, Blankenship stated, "This is a sidewalk, and this is a right-of-way, so we don't have to listen to them," Video, R. 62, 13:11:29–13:11:35, and in arguing with the Kentucky State Police troopers before his arrest, Blakenship stated, "This is public, isn't it?," *id.* at 14:18:31–14:18:32. Plaintiff fails to demonstrate, and the record fails to support his contention, that his lack of tickets is a pretextual reason for his arrest.

Absent any showing that the content of Plaintiff's message motivated his arrest, Plaintiff fails to raise a genuine dispute that the enforcement of the restricted area was content-neutral. Such a "content-neutral time, place, or manner restriction can survive intermediate scrutiny if [D]efendants make three showings." *See Reform Am.*, 37 F.4th at 1149.

### b. Significant Governmental Interest

First, the enforcement of the restricted area "must have served a 'significant governmental interest.'" *Id.* at 1149 (quoting *Ward*, 491 U.S. at 791). Defendant Metro names multiple interests in the restricted area: "to protect the venue and spectators attending the events at Churchill Downs," along with accounting for "perimeter and event security, traffic control and access, and safety and medical in support of the Kentucky Oaks and Kentucky Derby." Appellee Metro's Br. at 32 (quoting Permit Appl., R. 55-3, Page ID #487). Defendant Metro argues that public safety and security against potential violence at the Kentucky Derby is a particularly important interest because the event is one of the largest sporting events in the world, with an expected peak attendance of 160,000 people at any given time.

Those asserted reasons constitute significant governmental interests. The Supreme Court has recognized similar purposes as significant interests: "Because the [f]air attracts large crowds, it is apparent that the State's interest in the orderly movement and control of such an assembly of persons is a substantial consideration. As a general matter, it is clear that a [s]tate's interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective." *Heffron*, 452 U.S. at 650 (citations and quotations omitted). Additionally, this Court

has recognized "crowd control" as a legitimate reason for restriction, *Spingola*, 39 F. App'x at 984, and that "[p]ublic safety and security against potential violence are no doubt significant governmental interests." *Reform Am.*, 37 F.4th at 1149–50.

Plaintiff points to *Saieg* in arguing that Defendants do not assert a significant governmental interest in this case. In *Saieg*, the defendants identified the following interests in a leafleting restriction at a festival: "relieving pedestrian overcrowding, enhancing traffic flow, minimizing threats to public safety, and limiting disorderliness at the [f]estival." 641 F.3d at 736 (cleaned up). We held that such interests were merely "conjectural" under the facts of that case. *Id.* at 737 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)). We noted that the sidewalks along the festival's perimeter were "open for public use," such that festival organizers "intentionally maintained the public character of the sidewalks" and kept "those sidewalks open for traffic that is unrelated to the [f]estival." *Id.* Because the defendants chose "to keep the sidewalks open for public use," we held that the defendant showed that "the interests in crowd control and public safety are not so pressing that they justify restricting normal activity that occurs on streets and sidewalks." *Id.* We also noted that the festival organizers allowed vendors on the sidewalk, which further belied "the significance of their interest in clear sidewalks and crowd control." *Id.* Unlike in *Saieg*, however, Churchill Downs closed off from the public several sidewalks and streets along the event perimeter, including along Central Avenue, and enclosed the sidewalk where Plaintiff remained with fencing, marking the area with "NO TRESPASSING" signs. Plaintiff's own bodycam footage illustrates that the sidewalk along Central Avenue within the restricted area functioned as a pathway to the Kentucky Derby, with hundreds of patrons walking within the fenced area towards the event. Churchill Downs did not keep the "sidewalks open for traffic that is unrelated to the [event]." *See Saieg*, 641 F.3d at 737. Moreover, unlike in *Saieg*, the record here does not indicate that multiple authorized vendors were stationed along the enclosed sidewalk. The evidence, therefore, does not undercut Defendants' asserted interests, and this case is distinguishable from *Saieg*. Plaintiff thus fails to raise a genuine dispute that the enforcement of the restricted area served significant governmental interests.

### c. Narrowly Tailored

The enforcement of the restricted area must also be "narrowly tailored" to its purpose, "meaning that the restriction survives so long as the governmental interest would have been achieved less effectively in its absence." *Reform Am.*, 37 F.4th at 1149 (citations and quotations omitted). In "the context of intermediate scrutiny as applied to a content-neutral time, place, or manner restriction, we simply ask whether the state would have achieved its asserted interest 'less effectively absent the regulation.'" *Id.* at 1151 (quoting *Ward*, 491 U.S. at 799).

Defendants would have achieved their interests in safety and security of the event, along with traffic control, less effectively in the absence of a restricted area. A great number of people were expected to attend the event. Without establishing and enforcing a restricted area, security and police would have had no control over the individuals present within the immediate vicinity of the Kentucky Derby and may have had difficulty ensuring an orderly flow of people into the event. *See id.* at 1151 (holding that the defendants "have easily shown that the restricted area satisfies that standard" because without it, "officers would have had *no* control over which or how many individuals were present in the immediate vicinity of [the event]," and the restricted area produced "a smaller and more manageable crowd for law enforcement to superintend").

Plaintiff argues that the enforcement of the restricted area is not narrowly tailored because Defendants "burdened substantially more speech than necessary" by "ceding complete control over public property to a private entity, authorizing and enforcing the exclusion of Blankenship simply because he was unwanted." Appellant's Br. at 41. It is true that, to be narrowly tailored, a restriction may not burden "substantially more speech than is necessary to further [its] goal." *Spingola*, 39 F. App'x at 984 (citing *Ward*, 491 U.S. at 799). But Plaintiff again highlights only distinguishable cases for this argument. In *McCullen v. Coakley*, the Supreme Court held that "35-foot buffer zones [that prohibited protesting] at every [abortion] clinic across the [state]" is "hardly a narrowly tailored solution" because the defendant had "a variety of approaches that appear capable of serving its interests [in preventing congestion outside abortion clinics], without excluding individuals from areas historically open for speech and debate." 573 U.S. 464, 493–94 (2014). Churchill Downs did not create the equivalent of a

protest-free zone outside of every healthcare facility across the state, but rather temporarily restricted public access in the immediate streets and sidewalks near one of the largest sporting events in the world. Apart from restricting entrance to authorized ticket holders and properly credentialed individuals in the immediate area of the Kentucky Derby, there was not "a variety of approaches that appear capable of serving" the interests of public security and safety, along with traffic control, for the event. *Id.* at 494. Plaintiff also points to *McMahon v. City of Panama City Beach*, where the court held that a city's "stated policy of unquestioning deference to the whims of the permit holder in enforcing trespass statutes at a free and open-to-the-public event is, to put it gently, troubling." 180 F. Supp. 3d 1076, 1106 (N.D. Fla. 2016). Not only is *McMahon* not binding on this Court, but also the Kentucky Derby is not a "free and open-to-the-public event." *See id.* Further, the permit did not provide "unquestioning deference to the whims" of Churchill Downs, *see id.*, inasmuch as Churchill Downs was prohibited from taking any action "not allowed by established law," Sweeney Dep., R. 59-3, Page ID #873. Plaintiff, therefore, fails to raise a genuine dispute that the enforcement of the restricted area is narrowly tailored.

### d. Alternative Channels

Third, Defendants must show that the enforcement of the restricted area "left open ample alternative channels of communication" for Plaintiff to spread his message. *Reform Am.*, 37 F.4th at 1151 (citation and quotations omitted). The relevant question in this circuit is "whether the proffered alternatives allow the speaker to reach its intended audience." *Contributor v. City of Brentwood*, 726 F.3d 861, 865 (6th Cir. 2013) (citations omitted). Although Plaintiff does not articulate his intended audience in his brief, we may assume that the patrons of the Kentucky Derby, in addition to members of the public, were Plaintiff's intended audience. Plaintiff could have still reached this audience, and likely even more people, by moving just outside of the restricted area, only a half block away. In asking Plaintiff and his group to leave the restricted area, a security guard for Churchill Downs confirmed: "You can go on the other side all you want." Video, R. 62, 13:10:35–13:10:39. Indeed, other members of Plaintiff's group moved to a different location and were able to continue spreading their message.

Plaintiff argues that he never received "the option to move," Appellant's Br. at 43, but the record demonstrates that Plaintiff received multiple opportunities to move outside of the restricted area and to continue spreading his message. Security guards for Churchill Downs first instructed Plaintiff to leave and allowed Plaintiff the opportunity to move. Then Ball asked Plaintiff to leave, and later, the Kentucky State Police troopers gave Plaintiff another opportunity to move. Plaintiff refused these opportunities and remained in the restricted area.

Plaintiff alternatively argues that even if he had moved, relocating to the other side of the street is not an alternative channel of communication. But in circumstances similar to this case, this Court has held that a restricted area leaves open ample alternative channels where the plaintiff could share his or her message across the street or virtually anywhere else. *Reform Am.*, 37 F.4th at 1151 (holding that "the restricted area left in place copious alternative channels" because the plaintiff "could have engaged in its protest virtually anywhere outside the restricted area"); *Spingola*, 39 F. App'x at 984–85 (finding an "alternative channel for speech has obviously been provided" where the plaintiff could stand in a "designated speaking area" or "anywhere outside the grounds of the festival if he so chose"); *Grider v. Abramson*, 180 F.3d 739, 751 (6th Cir. 1999) ("[T]he plaintiffs nevertheless had ample alternate channels of public communication to proclaim their philosophical, political, or other agendas within the immediate geographical area of the two scheduled rally sites by carrying signs or banners, broadcasting on a street corner located outside but adjacent to the restricted area . . . or by arranging their own rally at a site outside the restricted area."). Plaintiff could have stood on public property (i.e., streets and sidewalks) anywhere outside the restricted area, including just a half block away, to spread his message. Moreover, Plaintiff's message would have likely still been fully audible to the patrons of the Kentucky Derby, since Plaintiff and his group were shouting and using megaphones and other sound equipment to convey their message. Plaintiff thus fails to raise a genuine dispute that he had ample alternative channels for communication.

Based on the record before us, it appears that Churchill Downs and the Kentucky State Police were concerned about Plaintiff and his group blocking or impeding the orderly entrance of the crowd into the Kentucky Derby, not seeking to thwart Plaintiff's efforts to disseminate his message. With all three showings met, the enforcement of the restricted area satisfies

intermediate scrutiny, and the district court did not err in granting summary judgment to Defendants on Plaintiff's free speech claim.

### C.  Free Exercise Claim

To the extent that Plaintiff appeals the district court's grant of summary judgment to Defendants on his free exercise claim under the First Amendment, Plaintiff has failed to preserve the issue on appeal.  To preserve an issue, a litigant must (1) "state the issue with sufficient clarity to give the court and opposing parties notice that it is asserting the issue" and (2) provide "some minimal level of argumentation in support of it" before the district court.  *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009).

Plaintiff brought a free exercise claim under the First Amendment against Defendants in his complaint.  In Plaintiff's motion for summary judgment, Plaintiff argued that "there is no genuine dispute as to any material fact concerning whether Defendants violated Plaintiff's First Amendment rights."  Pl.'s Mot., R. 58, Page ID #726.  In his motion, however, Plaintiff's argument focused solely on his free speech claim, and he provided little to no explanation regarding his free exercise claim.  The district court noted that Plaintiff "hardly distinguishes his two First Amendment claims" and held that Defendants were "entitled to judgment as a matter of law" because Plaintiff failed to show that the challenged restrictions had more than an incidental effect on Plaintiff's preaching.  Order, R. 101, Page ID #1332–33.

On appeal, in his statement of issues, Plaintiff refers generally to his "First Amendment rights."  *See* Appellant's Br. at 2.  In his entire appellate brief, Plaintiff mentions "free exercise" only twice, states that Defendants "unlawfully censored speech and religious exercise," and claims that Defendants "have successfully chilled Blankenship's core religious speech" in violation of the First Amendment.  *Id.* at 4, 30, 43, 44.  Besides these passing and conclusory remarks, Plaintiff does not provide any argumentation in his brief regarding his free exercise claim.  Although the Free Exercise and Free Speech Clauses of the First Amendment "work in tandem," they offer different protections and require separate analyses.  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022); *Autocam Corp. v. Sebelius*, 730 F.3d 618, 628 (6th Cir. 2013) ("The Free Exercise Clause and Free Speech Clause of the First Amendment have

historically been interpreted in very different ways." (citation omitted)), *vacated*, 573 U.S. 956 (2014). In instances where issues are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, we consider them forfeited." *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (citation and quotations omitted). Since Plaintiff failed to develop any argument regarding his free exercise claim under the First Amendment, Plaintiff failed to preserve this issue, and this Court need not address the merits of the claim.

### D. Due Process Claim

Plaintiff appeals the district court's grant of summary judgment to Defendants on his due process claim under the Fourteenth Amendment. "The Due Process Clauses of the Fifth and Fourteenth Amendments provide the constitutional foundation for the void-for-vagueness doctrine." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999) (citations omitted). As a preliminary matter, an "individual 'must establish that [he or] she has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause' before being allowed to raise a Due Process challenge." *Tomaszczuk v. Whitaker*, 909 F.3d 159, 164 (6th Cir. 2018) (quoting *Ashki v. INS*, 233 F.3d 913, 921 (6th Cir. 2000)). In the argument in support of his due process claim, Plaintiff alleges a violation of his First Amendment rights, which is sufficient to trigger protection of the Due Process Clause. *See Bauer v. Montgomery*, 215 F.3d 656, 661 (6th Cir. 2000) ("First Amendment freedoms of speech and association are within the term 'liberty' as protected by the due process clause of the Fourteenth Amendment." (citations omitted)).

To succeed on a vagueness claim, a plaintiff must show that the relevant ordinance "(1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement." *Brown v. City of Albion*, 136 F.4th 331, 344 (6th Cir. 2025) (cleaned up); *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

Plaintiff provides minimal argument in support of his due process claim. Plaintiff argues that Metro's policy is "vague" and "allows for unbridled discretion in enforcement." Appellant's Br. at 53. In a different section of his brief, Plaintiff describes the challenged policy as the

"permitting scheme" in which "Metro cedes control over public property to private entities by granting them a permit" pursuant to Metro's Code. *Id.* at 49. Although Plaintiff does not specifically address any portion of Metro's Code, Metro's Code provides in relevant part: "No person shall participate or take part in, promote, organize, form, hold, or assist in organizing any parade or public assembly within Jefferson County unless a permit has been obtained from the Licensing and Permit Division designee." LOUISVILLE-JEFFERSON, KY., CODE OF ORDINANCES § 100.02(A).

Plaintiff does not argue that the permitting scheme "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *See Brown*, 136 F.4th at 344. Further, Plaintiff does not argue that he himself was unable to understand what conduct the permitting scheme prohibits (nor does the permitting scheme prohibit any conduct of Plaintiff's for that matter, as Plaintiff was not a permit holder). Therefore, the first method of demonstrating unconstitutional vagueness is foreclosed.

As to the second method, Plaintiff fails to show that the permitting scheme "authorizes or even encourages arbitrary and discriminatory enforcement." *See id.* (cleaned up). To that end, Plaintiff offers only a bare assertion: "The permit itself was vague, and together with Metro's laissez-faire treatment of the permit, led to Churchill Downs treating public streets and sidewalks like their own private property, and excluding whomever they wished based on a non-existent ticketing requirement." Appellant's Br. at 53–54. Plaintiff has neither pointed to any section of Metro's Code, nor highlighted any term or provision in Metro's Code, that Plaintiff believes is vague. *See 600 Marshall Ent. Concepts, LLC v. City of Memphis*, 705 F.3d 576, 587 (6th Cir. 2013) (holding that the plaintiff "has not shown that the [o]rdinance itself is unconstitutionally vague" where the plaintiff "has not pointed to any term or provision in the [o]rdinance that it believes is vague"). Moreover, although the permitting scheme may have allowed public streets to function temporarily as Churchill Downs's private property for the duration of the Kentucky Derby, the permitting scheme never authorized or encouraged Churchill Downs to exclude whomever they wished in violation of the law. As previously mentioned, Metro's Code provides: "A permitee shall comply with all terms and conditions set forth in a permit, with the provisions of this chapter, and with all other applicable laws and ordinances." LOUISVILLE-

JEFFERSON, KY., CODE OF ORDINANCES § 100.08. The special events manager for Metro reaffirmed that the permit did not allow Churchill Downs to take any action that is "not allowed by established law." Sweeney Dep., R. 59-3, Page ID #873.

Additionally, the permitting scheme itself was not even enforced against Plaintiff in this case. Plaintiff testified that Metro representatives had no involvement in his arrest. Defendant Young alone made the decision to arrest Plaintiff, and he did so because Plaintiff "was remaining unlawfully on the premises after having been told numerous times to vacate and refusing to do so." Young Dep., R. 55-2, Page ID #407–08. Defendant Young enforced only a criminal trespass law against Plaintiff. *See* Ky. Rev. Stat. § 511.080 ("A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises."). Plaintiff thus fails to demonstrate that in this case, let alone any case, Metro's code "authorizes or even encourages arbitrary and discriminatory enforcement." *See Brown*, 136 F.4th at 344 (cleaned up). The district court did not err in granting summary judgment to Defendants on Plaintiff's due process claim.

### E. *Monell* Claim

Plaintiff appeals the district court's grant of summary judgment to Defendant Metro on his municipal liability claim under *Monell*. Under *Monell*'s doctrine of municipal liability, "an injured plaintiff can sue a local government directly for the unconstitutional actions of its employees when those actions are taken pursuant to a policy or custom of the governing body." *Ramage v. Louisville-Jefferson Cnty. Metro Gov't*, 520 F. App'x 341, 345 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). However, "there is no liability under *Monell* without an underlying constitutional violation." *Zucker v. City of Farmington Hills*, 643 F. App'x 555, 570 (6th Cir. 2016) (citing *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). Therefore, a plaintiff "must show that [the local government] violated their constitutional rights before they can establish *Monell* liability." *Hart v. Twp. of Presque Isle*, No. 24-2124, 2025 WL 2591409, at *3 (6th Cir. Sept. 8, 2025)). As set forth above, Plaintiff fails to demonstrate an underlying constitutional violation. Metro, therefore, cannot be held liable under *Monell*. *See Martin v. Maurer*, 581 F. App'x 509, 512 (6th Cir. 2014) (holding that

a plaintiff's *Monell* claim fails because she "failed to state a constitutional violation"). Since Plaintiff fails to demonstrate an underlying constitutional violation, the district court did not err in granting summary judgment to Defendant Metro as to Plaintiff's *Monell* claim.

### F. Qualified Immunity

Plaintiff appeals the district court's grant of qualified immunity to Defendant Young at summary judgment. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To prevail against a defense of qualified immunity, a plaintiff must first establish the constitutional right that [he or] she claims was violated by the defendants." *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002); *see Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." (citation and quotations omitted)). As set forth above, Plaintiff cannot overcome Defendant Young's defense of qualified immunity because Plaintiff has not established a violation of a constitutional right. *See Anderson v. Ravenna Twp. Fire Dep't.*, 159 F. App'x 619, 626 (6th Cir. 2005) (holding that the plaintiff "cannot overcome the individual defendants' defense of qualified immunity with respect to being sued in their individual capacities" because the plaintiff "failed to demonstrate that there was any violation of his constitutional rights" (citations omitted)). Since Plaintiff fails to establish a violation of a constitutional right, the district court did not err in granting qualified immunity to Defendant Young on Plaintiff's claims against Defendant Young in his individual capacity.

### III. CONCLUSION

For the reasons set forth above, this Court **AFFIRMS** the judgment of the district court.